## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

Richard and Melba Aguilar; Clark Amos; Preston Amos; Thomas Barnes; Henry and Julie Barthel; Northwest Properties (1973) Ltd., c/o Mark Bernstein; Tom and Donna Bertani; Kristy Bova; David and Teresa Diane Caldwell; Albert Carrell; Bonita Cobb; Sharon Cobb; Casey and Delores Cook; Jerry Cronkhite; Mark Cunningham; Daryll Currier; Roy Currier; Sam Currier; Thomas Currier; Charles Davis; Charlotte Garrett; William Gaylor; Suzanne Glisson; Clayton Givens; Linda Givens; Robert Givens; Aubrey and Randall Harp; Billy Harrison; Odis Hash; Donna Hogshooter; John and Audrey Holland; Doris Howard; Barbara and Gifford Jordan; David and Mary Kellogg; Stanley Kuhlo; Stanko Matayo; Darren and Sheila Mays; Carol McCarthy as successor co-trustee of the Angelene Block Revocable Trust and co-trustee of the Carol A. McCarthy Living Trust; William McLemore; Mark and Cindy Merlotti; Lorena Messenger; Ben Miller; Hal and Margaret Millsap; Bob Moore; Barbara O'Hanlon as successor co-trustee of the Angelene Block Revocable Trust and as trustee of the Barbara J. O'Hanlon Living Trust; Mary O'Sullivan, individually and as Trustee of the Thomas E. O'Sullivan Revocable Living Trust and Neil J. O'Sullivan Trust, and Executor of Neil J. O'Sullivan Estate; Rulolf Ouwens; William and Carol Phillips; Phllip Rosemann; Buddy Quessenberry; Elaine Reed; Darren and Debbie Rogers; Betty Rollon; Leonard Roman; David Schultz Arlene Sincoski; Homer, Dorothy and Gary Smith; Judith Smith; Arlene and Deborah Stevens; Winston Vines; Barbara Vollmar; Lewis Vollmar; William Wantling; Brad Werner, Trustee of the J.H. Werner Revocable Living Trust; Loren Winterhof; Eric and Jill Wittenmyer; and Dorothy Zeigler,

                    Plaintiffs,

vs.

Spencer Fane Britt & Browne, LLP and James Dankenbring,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
.)
)
)
)
)
)
)
)
)
)
)
)

Case No.







**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs, for their Complaint and claims against Defendants Spencer Fane Britt & Browne LLP and James Dankenbring, allege as follows:

### NATURE OF ACTION

1.      On April 13, 2012, Martin T. Sigillito ("Sigillito"), a St. Louis lawyer and American Anglican Bishop, was convicted of twenty counts of fraud for bilking Plaintiffs and other victims out of more than $51 million in connection with a scam known as the British Lending Program. Sigillito is serving forty years in federal prison. His co-conspirator, J. Scott Brown ("Brown") plead guilty and is serving three years in federal prison.

2.      Sigillito committed one of the largest, if not the largest, Ponzi and embezzling schemes in St. Louis history. Not a single penny of the victims' money was invested in real estate developments in England as promised. Rather, Sigillito stole his victims' money to support an extravagant lifestyle, while he used other, later victim's money to sustain his Ponzi and embezzling scheme and pay purported interest payments to existing investors.

3.      By this Complaint, Plaintiffs bring claims against Defendants Spencer Fane Britt & Browne LLP for their participation in Sigillito's fraud. Defendants participated in and facilitated the Ponzi scheme by knowingly accepting as payee embezzled funds that Sigillito used to pay his debts to Defendants and others in violation of law.

### JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction and Defendants are subject to this Court's jurisdiction because each has made contracts and committed tortious acts within Missouri.

5.      Venue is proper in this Court because St. Louis County was the principal place of residence of at least one of the plaintiffs on the date that plaintiff was first injured by Cole Taylor Bank or by Millennium Trust.

### THE PARTIES

6.      The Plaintiffs are more than 80 individuals who fell victim to Sigillito's Ponzi scheme.

7.      Phillip Rosemann resides in St. Louis, Missouri and invested approximately $13,251,106.86 in the Ponzi scheme before April 1, 2007.

8.      Richard and Melba Aguilar reside in St. Louis, Missouri and invested approximately $321,582.36 before April 1, 2007 and lost another $35,000 after that date.

9.      Clark Amos resides in St. Louis, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $250,000.

10.     Preston Amos resides in St. Louis, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $50,000.

11.     Thomas Barnes resides in Grove, Oklahoma and afer April 1, 2007 invested in the Ponzi scheme and lost $56,000.

12.     Henry and Julia Barthel reside in Fenton, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $50,000.

13.     Northwest Properties (1973) Ltd. is a Canadian company and it lost $1,000,000.

14.     Tom and Donna Bertani reside in St. Louis, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $68,355.

15.    Kristy Bova resides in Springdale, Arkansas and after April 1, 2007 invested in the Ponzi scheme and lost $5,000.

16.    David and Teresa Diane Caldwell reside in Hot Springs, Arkansas and invested approximately $192,249.14 in the Ponzi scheme before April 1, 2007.

17.    Albert Carrell resides in Cedar Springs, Michigan and invested approximately $84,450 in the Ponzi scheme before April 1, 2007.

18.    Bonita Cobb resides in St. Petersburg, Florida and afer April 1, 2007 invested in the Ponzi scheme and lost $1,800,000.

19.    Sharon Cobb resides in Seminole, Florida and invested approximately $365,000 in the Ponzi scheme before April 1, 2007 and lost another $115,000 after that date.

20.    Casey and Delores Cook reside in Oklahoma City, Oklahoma and afer April 1, 2007 invested in the Ponzi scheme and lost $50,000.

21.    Jerry Cronkhite resides in Oak Burr, Michigan and invested $100,700 in the Ponzi scheme before April 1, 2007.

22.    Mark Cunningham resides in Farmington, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost approximately $193,319.89.

23.    Daryll Currier resides in Howe, Indiana and afer April 1, 2007 invested in the Ponzi scheme and lost $98,750.

24.    Roy Currier resides in Middlebury, Indiana and afer April 1, 2007 invested in the Ponzi scheme and lost $98,750.

25.    Sam Currier resides in Oak Burr, Michigan who  invested approximately $565,675 in the Ponzi scheme before April 1, 2007.

26.    Thomas Currier resides in Howe, Indiana and afer April 1, 2007 invested in the Ponzi scheme and lost $198,750.00.

27.     Sam Currier resides in Oak Burr, Michigan and afer April 1, 2007 invested in the Ponzi scheme and lost $50,000.

28.     Charles Davis resides in Athens, Texas and invested approximately $522,460.59 in the Ponzi scheme before April 1, 2007.

29.     Charlotte Garrett resides in Jefferson City, Missouri  and afer April 1, 2007 invested in the Ponzi scheme and lost $435,000.

30.     William Gaylor  resides in Hamilton, Ohio and invested $250,000 in the Ponzi scheme between  between January 20, 2002 and April 1, 2008. Davis lost approximately $509,560.59.

31.     Clayton Givens resides in St. Louis and afer April 1, 2007 invested in the Ponzi scheme and lost $100,000.

32.     Linda Givens resides in High Ridge, Missouri and invested approximately $1,039,895.51 in the Ponzi scheme before April 1, 2007.

33.     Robert  Givens resides in Overland Park, Kansas and afer April 1, 2007 invested in the Ponzi scheme and lost $50,000.

34.     Suzanne Glisson resides in St. Petersburg, Florida and afer April 1, 2007 invested in the Ponzi scheme and lost $250,000.

35.     Aubrey and Randall Harp reside in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $10,000.

36.     Billy Harrison resides in Lowell, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $45,000.

37.     Odis Hash resides in Bentonville, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $49,425.

38.     Donna Hogshooter resides in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $400.

39.     John and Audrey Holland reside in Theodosia, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost approximately $109,784.86.

40.     Doris Howard resides in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $50,000.

41.     Barbara and Gifford Jordan reside in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $54,000.

42.     David and Mary Kellogg reside in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $5,000.

43.     Stanley Kuhlo resides in St. Charles, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost approximately $222,126.39.

44.     Stanko Matayo resides in Bella Vista, Arkansas and invested $130,786 in the Ponzi scheme before April 1, 2007.

45.     Daren and Sheila Mays reside in Tampa, Florida and afer April 1, 2007 invested in the Ponzi scheme and lost approximately $150,286.55.

46.     Carol McCarthy, successor co-trustee of the Angelene Block Revocable Trust and co-trustee of the Carol A. McCarthy Living Trust, resides in Kirkwood, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $625,000. Third party Kathy Winter lost $99,450 and has assigned all claims to that loss to McCarthy.

47.     William McLemore resides in Gainesville Florida and afer April 1, 2007 invested in the Ponzi scheme and lost $100,000.

48.     Mark, Cindy, and Marie Merlotti reside in St. Louis, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $1,108,000.

49.     Lorena Messenger resides in Springfield, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $70,023.

50.     Ben Miller, a resident of St. Louis, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $300,000.

51.     Hal and Margaret Jean Millsap reside in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $70,000.

52.     Bob Moore resides in Decatur, Arkansas and invested approximately $23,109.25 in the Ponzi scheme before April 1, 2007.

53.     Barbara O'Hanlon, successor co-trustee of the Angelene Block Revocable Trust and trustee of the Barbara J. O'Hanlon Living Trust, resides in Kirkwood, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $125,000.

54.     Mary O'Sullivan, Trustee of the Thomas E. O'Sullivan Revocable Living Trust and Neil J. O'Sullivan Trust, and Executor of the Neil J. O'Sullivan Estate, resides in St. Louis, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost approximately $1,063,811.

55.     Rudolf Ouwens resides in Phoenix, Arizona and invested $80,000 in the Ponzi scheme before April 1, 2007.

56.     Ronald Pastor resides in Howard City, Michigan and afer April 1, 2007 invested in the Ponzi scheme and lost approximately $4,208.59.

57.     William and Carol Phillips reside in Arkadelphia, Arkansas and invested approximately $112,073.79 in the Ponzi scheme before April 1, 2007.

58.     Buddy Quessenberry resides in Seymore, Missouri and afer April 1, 2007 invested in the Ponzi scheme and lost $175,230.

59.     Elaine Reed resides in Cassopolis, Michigan and afer April 1, 2007 invested in the Ponzi scheme and lost $26,000.

60.     Darren and Debbie Rogers reside in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $10,000.

61.     Betty Rollon resides in Benton, Arkansas and invested approximately $91,265.34 in the Ponzi scheme before April 1, 2007.

62.     Leonard Roman resides in Hiram, Ohio and afer April 1, 2007 invested in the Ponzi scheme and lost $50,334.62.

63.     David Schultz resides in Battle Creek, Michigan and invested approximately $70,229.38 in the Ponzi scheme before April 1, 2007.

64.     Arlene Sincoski resides in Gainesville, Florida and afer April 1, 2007 invested in the Ponzi scheme and lost $2,800.

65.     Homer, Dorothy and Gary Smith reside in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $185,000.

66.     Judith Smith resides in Bella Vista, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $50,000.

67.     Arlene and Deborah Stevens reside in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $58,000.

68.     Kent Sturhahn resides in Quincy, Illinois and afer April 1, 2007 invested in the Ponzi scheme and lost $85,000.

69.     Winston Vines resides in Austin, Arkansas and invested $100,000 in the Ponzi scheme before April 1, 2007.

70.     Barbara Vollmar resides in Fenton, Missouri and invested approximately $359,330.68 in the Ponzi scheme before April 1, 2007.

71.     Lewis Vollmar resides in St. Louis, Missouri and invested approximately $767,973.12 in the Ponzi scheme before April 1, 2007.

72.     William Wantling resides in Jacksonville Beach, Florida and afer April 1, 2007 invested in the Ponzi scheme and lost $150,000.

73.     Brad Werner, Trustee of the J.H. Werner Revocable Living Trust, resides in St. Louis, Missouri and the Trust lost $1,000,000.

74.     Loren Winterhof resides in Jackson, Missouri and invested approximately $84,334.94 in the Ponzi scheme between before April 1, 2007.

75.     Eric and Jill Wittenmyer reside in Chicago, Illinois and afer April 1, 2007 invested in the Ponzi scheme and lost $100,000.

76.     Dorothy Zeigler resides in Springdale, Arkansas and afer April 1, 2007 invested in the Ponzi scheme and lost $65,000.

77.     Defendant Spencer Fane Britt & Browne LLP is a Missouri limited liability partnership engaged in the practice of law with offices in St. Louis County and elsewhere.

78.     Defendant James Dankenbring is an individual residing in St. Louis County, Missouri.  and at all times relevant was duly licensed lawyer in the State of Missouri associated with Defendant Spencer Fane.

### GENERAL ALLEGATIONS

79.     Sigillito is a lawyer at all relevant times maintained a lawyer trust account for client and third party funds. His lawyer trust account was a fiduciary account commonly known as an Interest On Lawyers Trust Account ("IOLTA") account.

80.     Sigillito marketed the BLP by emphasizing his use of an IOLTA account as evidence that the BLP was a safe investment. He had no real law practice and virtually all money flowing into his IOLTA account came from and belonged to investors in the BLP.

81.     Sigillito preferred individuals with IRA accounts as investors in the BLP. These people typically invested for retirement and almost always renewed their BLP loans annually. The continued rollovers allowed the BLP to avoid making cash distributions and the accrued interest reflected on IRA account statements indicated a safe and growing investment for retirement.

82.     Federal law requires IRA accounts to have a custodian and banks often serve as IRA custodians. In 2001, Allegiant Bank in St. Louis was custodian for virtually everyone invested in the BLP through an IRA account. In or around October 2001, Allegiant developed suspicions about Sigillito and the BLP and took steps to resign and force Sigillito to find a successor custodian.

83.     In 2001, Sigillito used an English law firm, Mark Gilbert Morse ("MGM") to prepare loan agreement and provide other services for BLP. In or around 2001, Allegiant contacted MGM and expressed concerns about Sigillito and the BLP.

84.     Sigillito and Brown learned of Allegiant's concerns and thereafter Sigillito hired Defendants to represent him. On October 16, 2001, Brown sent an email to Sigillito and Dankenbring outlining Allegiant's concerns: "It is now confirm by Morse that it was Allegiant Bank that initially contacted MGM. The reason for the contact was to express

Allegiant's concerns about the propriety/legality of the deals being done, the methodology of the monies being transferred, the purposes for the monies, etc. Allegiant and MGM have had a couple of meetings . . . at which on one occasion a member of the Husch [Blackwell law] firm [representing MGM] was in attendance. At those sessions explanations were given by MGM. The result were that Allegiant were said to be satisfied with the miners' widows' claims role and MGM's borrowings, but that Allegiant reacted very adversely to the property development deals. Apparently their main concerns arose from the rates of interest charged and the arrangements fees. Some Allegiant member is said to have made the implication or recited to MGM that 'Marty needed a damned good criminal lawyer', and that 'what was going on was verging on fraud', or words to that effect. As to the matter of Marty, Kevin and I having a meeting with MGM next week, Husch has told MGM that this was not on unless and until members of the Husch firm were to be present at such a meeting. This stance seems quite at variance to what you learned form the Husch team yesterday, and one wonders what the true picture is here. . . . Most importantly, however, it is plain as a pikestaff that Allegiant has to be persuaded not to in any way sink our ship with any subsequent banking house, such as Bank of Blue Valley here in Overland Park. Their undertaking on that is a critical issue. Without it, the business is over, and at great liability and cost not only to all three of us but also to MGM as well."

85.   The following day, on October 17, 2001, Brown sent another email to Sigillito and Dankenbring stating: "Further to our discussions yesterday about the Husch firm's letter,

etc., this morning I have had a signal from the UK that perhaps we are being 'set up' to fail. . . . Husch report to MGM that it is their opinion that Marty and I have gravely breached not only MO state but also federal civil and criminal statutes. As a result, Morse believes that we (Marty and I) are being 'set up' by his firm's lawyers, Husch. Husch are seeking to present us to MGM as having no negotiating capability. How could we have? We are painted to be, in effect, criminals or at least persons immediately subject to severe criminal sanctions invested in the BLP."

86.     Dankenbring at all relevant times was the agent, servant and employee of Spencer Fane and acting within the course and scope of his agency and employment.

87.     Defendants at all relevant times knew that Allegiant suspected Sigillito was engaged in criminal wrongdoing and violating state and federal laws. In 2001, Defendants carefully analyzed Sigillito potential exposure to liability under federal securities laws.

88.     Dankenbring wrote a memorandum to Sigillito dated November 26, 2001. In his memorandum, Dankenbring explained to Sigillito that, based on his analysis, the BLP loans could "expose you to potential liability arising from regulatory enforcement actions, as well as civil claims." Dankenbring's legal analysis was based on a thorough understanding of how the BLP worked.

89.     Beginning in or around November 2001 and at all relevant times, Dankenbring had knowledge that investor funds intended for investment in BLP were first deposited into

Sigillito's IOLTA account and then supposed to go to Smith and Distinctive in England for their use.

90.     In or around 2002 or 2003, Dankenbring represented Sigillito and Brown in connection with the Kansas state securities commission's inquiries about the BLP. He traveled to Kansas to meet with a representative of the state's securities department.

91.     In a related matter, Dankenbring represented Hal Milsap from Arkansas in connection with inquiries from the Arkansas state securities commission about the BLP in 2009. He traveled to Little Rock and attended a meeting with Milsap and a representative of the department.  As soon as the representative started asking Milsap questions about the BLP, Dankenbring advised his client Milsap to invoke his Fifth Amendment privilege against self-incrimination but allowed Milsap to answer the questions put to him by the State of Arkansas.

92.     In or around 2004, Dankenbring helped draft a Confidential Private Offering Memorandum for Sigillito-Brown LLC for a $5 million private placement of unsecured promissory notes with a $50,000 minimum investment.

93.     In or around April 2007, Svylatoslav Levin ("Levin"), a Russian piano player from Kansas City and investor in the BLP, claimed that Sigillito and Smith owed him money, hired a lawyer, and threatened to file a lawsuit.

94.     In 2007, Sigillito hired Defendants again, this time to represent him against Levin. Jim Hodges, Levin's attorney, emailed Dankenbring on May 2, 2007 to advise that

Levin, " has information he believes should encourage your clients to settle outside of the public arena. . . If there is no worry of public disclosure then the filing of a lawsuit and discovery should not be the driving force towards settlement."

95.     On May 11, 2007, Dankenbring received an email from Levin's friend and fellow BLP investor, Wood Dickinson who claimed Sigillito and Brown "owed me personally over $3 million. They refused to pay me back my money according to the contacts Brown negotiated with me and Smith signed... Brown misrepresented the Bexhill property and finally paid for that misrepresentation as well . . . I stumbled on things Brown wants no one to know. . . . If [Levin] files it will become a matter of public record."

96.     Dankenbring negotiated a settlement, and Sigillito and Smith agreed to pay Levin $718,000. The settlement agreement with Levin stated that Sigillito and the other settling parties "shall pay to the Levin Parties the total sum of Seven Hundred Eighteen Thousand Dollars."

97.     Defendants at all relevant times had knowledge that the settlement agreement with Levin imposed a personal obligation on Sigillito to pay Levin.

98.     In 2008, Sigillito hired Defendants to represent him connection with Millennium Trust Company LLC ("Millennium"), the successor custodian for Allegiant. In or around April 2008, Millennium suspected and later concluded that Sigillito was using the BLP to run a Ponzi scheme.

99. On or about April 4, 2008, Scott McCartan, CEO of Millennium Trust called Sigillito's office seeking information about the Smith and the BLP. Sigillito's assistant Liz Stajduhar ("Stajduhar") took the call After she hung up, she sent out two emails. The first was to Brown at 11:38 am: "I have talked with Scott McCartan, CEO at MTC re the documents and I explained to him the changes we have made to the agreement system and how we had January and February agreements to them in a timely manner and he agreed. . . He then questioned me about the name changes . . . he questioned about Derek's contact info I told him I did not have it (caught me off guard) then he said he questioned whether or not Derek actually existed. . . but his true question were where as to how the program worked and whether or not it is legit."

100. Stajduhar sent out a second email at 12:12 pm on April 4, 2008 to Sigillito: "Scott McCartan, Millennium CEO needs to talk with you. He has told everyone to stop purchases and renewals until he speaks with you and clears up some things. . . . He also questioned the Company's name changes and Derek's existence and the legitimacy of the program and thus need to speak with you."

101. Following McCartan's telephone call with Stajduhar on April 4, 2008, Millennium made repeated attempts to get Smith's contact information from Sigillito's office. Sigillito knew better than to give Millennium a way to contact Smith. In a letter mailed to Sigillito dated June 16, 2008, Mr. McCartan reminds Sigillito:

"We are still waiting for you to comply with our request to supply us with direct contact information for Distinctive Properties. When you do so, we will confirm the above information to them directly."

102.     So did Dankenbring. In a letter mailed to Mr. McCartan dated June 19, 2008, Dankenbring told him: "I note in various communications that you have requested contact information for Distinctive Properties, and for the law firm of Swinburne & Jackson. This is to confirm that my client has, in fact, provided this information to you (not to mention the fact that this information is contained in the promissory notes which are in your possession)." All McCartan wanted it seems was phone number and Dankenbring, who knew all about the BLP and how it worked, was not about to help McCartan or anyone else at Millennium get in touch with Smith.

103.     Millennium's suspicions convinced the company that Sigillito and the IRA accounts invested in the BLP had to go. Millennium devised a plan. First, it advised Sigillito of a "change in policy" under which Millennium Trust would no longer serve as custodian of offshore investments.

104.     Millennium discovered that a number of BLP loans in the IRA accounts were in default. As custodian, an IRA account getting transferred with assets in default exposed Millennium to unwanted scrutiny. Millennium, to protect itself, told Sigillito that IRA accounts holding matured notes or loan agreements in the BLP could not be transferred to

a successor custodian until Millennium Trust received full payment of the principal and accrued interest due.

105.    Millennium soon realized that waiting to move the IRA accounts until Sigillito brought the loans current was a bad idea. New money is the lifeblood of Ponzi scheme. Without it, Sigillito would have no chance of bringing the BLP loans current. Millennium's plan to protect itself actually exposed the company to risk of the Ponzi scheme collapsing while the IRA accounts were at Millennium.

106.    Millennium needed to find a solution to this problem. Instead of waiting for Sigillito to bring the loans current, Millennium proposed an indemnification agreement with Sigillito. He could move the accounts with loans in default if he indemnified Millennium from any adverse results.

107.    On June 25, 2008, Dankenbring emailed Sigillito to update him on discussions related to the indemnification idea. "I just finished a very pleasant conversation with Millennium's general counsel, Brad Markham and Jennifer Abernathy. Although they will submit a demand to Distinctive as to those notes that have, or are about to mature (for Millennium's own protection), they are also willing to transfer notes in kind, provided that the underlying records are in order, and provided that they have received such a request from the lender. . . (As a side note, we obviously do not want Millennium alarming Enterprise by suggesting that records are incorrect)." No, obviously not.

108.    Meanwhile, Millennium was not ready to give up trying to reach Smith. In a letter dated June 27, 2008, Millennium's General Counsel Brad Markham ("Markham") told Dankenbring: "In answer to your letter of June to our CEO Scott McCartan, and to confirm our telephone conversation, . . . The contact information provide by your client for Distinctive Properties has not proved productive and going through your client continues to be the only practical way to address issues with the Notes. As you acknowledged during our call, the current Notes must be in proper order before we can transfer them to Enterprise. Those accounts holding Notes in proper order are processes when transfer paperwork is received. However, many of the Notes are not in proper order. . . . As agreed on our call, please find attached an indemnification from Martin to Millennium covering the transfer of the Notes."

109.    Dankenbring's letter dated July 9, 2008 and mailed in response to Markham reflects Sigillito and Dankenbring's resolve  to keep Millennium away from Smith: "while my client disputes many of the facts recited in your letter to me of June 27, 2008, at  this stage I don't believe it would be productive to debate these points further." Dankenbring enclosed with that letter a clean and redline version of the Indemnification Agreement.

110.    Markham refused to accept Dankenbring's position on productive debate. On July 14, 2008, he sent Dankenbring an email stating, "To my knowledge Distinctive Properties still refuses to deal directly with Millennium on note issues and insists on going through your client."

111.   Dankenbring shared Markham's email with Sigillito who proposed the following response for Dankenbring to send Markham: "You allude to the fact that Distinctive Properties does not deal with you directly on any note issues. It is not within my client's purview or power to require Distinctive Properties to deal with any entity should it choose not to."

112.   Dankenbring mailed Markham a letter dated July 16, 2008 stating just what Sigillito had suggested, "You allude to the fact that Distinctive Properties does not deal with you directly on any note issues. It is not within my client's purview or power to require Distinctive Properties to deal with any entity should it choose not to." Dankenbring also enclosed with his letter the signed indemnification agreement between Sigillito and Millennium.

113.   Sigillito, upon information and belief, told Dankenbring about his communications with Millennium Trust and Dankenbring had knowledge of Millennium's new policies and proposals for Sigillito.

114.   Sigillito paid Defendants with money directly out of his IOLTA account. Between April 2007 and September 2009, Sigillito wrote approximately twelve checks from his IOLTA account to Spencer Fane and/or Dankenbring as payee. During that time, Sigillito on approximately one occasion also sent money by wire transfer from his IOLTA account to Spencer Fane and/or Dankenbring as payee. Defendants received and  accepted these checks and the wire transfer as payee.

115.    Sigillito sent Defendants money from his IOLTA account to Defendants for his personal benefit on or about:

(A).    April 1, 2007 by check number 1076 for $13,550.75;

(B).    April 23, 2007 by check number 1086 for $14,085.55;

(C).    June 7, 2007 by check number 1091 for $3,725.63;

(D).    July 19, 2007 by check number 1100 for $13,086.57;

(E).    August 5, 2008 by check number 1176 for $8,290.56;

(F).    August 5,2008 by check number 1174 for $1,875.00;

(G).    September 8, 2008 by check number 1189 for $$1,913.75

(H).    October 20, 2008 by check number 1245 for $281.25;

(I).    December 31, 2008 by check number 1255 for $482.99;

(J).    February 12, 2009 by check number 1211 for $562.50;

(K).    July 27, 2009 by check number 1286 for $375.00; and

(L).    September 21, 2009 by check number 1308 for $5,572.88.

116.    Sigillito sent Defendants $720,000 from his IOLTA account by wire transfer to Defendants for his personal benefit on or about May 15, 2007.

117.    Thereafter, Defendants upon information and belief transferred $718,000 of Plaintiffs' embezzled funds to Levin by check from Spencer Fane's business account in payment of the settlement for Sigillito's benefit.

118.    Sigillito, between approximately April 1, 2007 and September 21, 2009, Sigillito sent Spencer Fane and/or Dankenbring as payee a total of approximately $778,229.55 from his IOLTA account.

119.    Defendants at all relevant times had knowledge that Sigillito was a fiduciary and had fiduciary obligations with respect to his IOLTA account and the third party funds deposited into that account.

120.    All of the money Sigillito sent to Defendants by check out of his IOLTA account as alleged in this Complaint, upon information and belief, was for payment of Sigillito's debt to Defendants for legal services.

121.    Defendants at all relevant times had knowledge that the checks Sigillito sent to them out of his IOLTA account were for Sigillito's personal benefit.

122.    Defendants at all relevant times had knowledge that the wire transfer of funds Sigillito sent to them out of his IOLTA account were for Sigillito's personal benefit.

123.    Defendants at all relevant times had knowledge that the $2,000 Defendants retained for themselves from the $720,000 wire transfer was in payment of personal debt Sigillito owed Defendants.

124.    Defendants, based upon Dankenbring's professional knowledge and expertise, together with his unique knowledge of the BLP gained from representing Sigillito in or around 2001, had knowledge at all relevant times that the monies from Sigillito by check and wire were:

(A).   Funds from Sigillito's IOLTA account;

(B).   Funds from a fiduciary account;

(C).   Fiduciary funds;

(D).   Funds that did not belong to Sigillito; and

(E).   Funds that belonged to investors in the BLP or other third parties.

125.   Defendants at all relevant times had knowledge of with IOLTA accounts and the applicable rules governing IOLTA accounts.

126.   When Defendants received the checks and wire from Sigillito's IOLTA account, and at all relevant times, Defendants had knowledge that Sigillito:

(A).   Had fiduciary obligations with respect to funds deposited into his IOLTA account;

(B).   Had fiduciary obligations to the people whose money was deposited into his IOLTA account and intended for investment in the BLP;

(C).   Was prohibited from using fiduciary funds from his IOLTA account to pay personal debts and obligations; and

(D).   Was prohibited from using investor funds deposited into his IOLTA account to pay personal debts and obligations.

127.   On each occasion Defendants received checks and the wire from Sigillito as alleged herein and at all relevant times, Defendants had notice of facts which, if unexplained, would show that Sigillito was transferring and using money from his IOLTA account that did

not belong to him but, instead, belonged to BLP investors or other third party or parties to pay a personal debts.

128.    On each occasion that Defendants had notice of facts which, if unexplained, would show that Sigillito was transferring and using money from his IOLTA account that did not belong to him to pay personal debts, and at all relevant times, Defendants were bound under the Uniform Fiduciaries Law ("UFL"), § 469.270, RSMo., to inquire whether Sigillito was committing a breach of his obligation as fiduciary.

129.    On each occasion that Defendants had notice of such facts, and at all relevant times, Defendant failed to inquire whether Sigillito was committing a breach of his obligation as fiduciary in using money from his IOLTA account to pay personal debt.

130.    The money that Sigillito transferred to Defendants from his IOLTA account belonged to those Plaintiffs who give money to Sigillito for investment in the BLP before the dates on which Sigillito transferred that money to Defendants.

131.    Each transfer of money by check or wire from Sigillito's IOLTA account to Defendants as alleged herein was a transfer of money that belonged to Plaintiffs who invested in the BLP on or before the date of the particular transfer of funds to Defendants out of Sigillito's IOLTA account.

132.    Each transfer of money by check or wire from Sigillito's IOLTA account to Defendants as alleged herein was a breach of Sigillito's fiduciary duties and obligations.

133.    Afer April 1, 2007, and on various times and occasions in addition to the times and occasions alleged herein, Sigillito transferred approximately $11,067,804 belonging to Plaintiffs who invested in the BLP after April 1, 2007 from his IOLTA account for personal benefit in breach of his fiduciary duties and obligations.

134.    On or about April 22, 2014, Sigillito filed his lawsuit against Dankenbring and Spencer Fane in this Court styled *Martin T. Sigillito v. James R. Dankenbring and Spencer Fane Britt & Browne LLP*, Cause No. 14SL-CC1309 ("Sigillito Lawsuit").

135.    Dankenbring, upon information and belief, while engaged in the continuing representation of Sigillito, became familiar with the BLP and its loan process and operations.

136.    Defendants, upon information and belief, while engaged in the continuing representation of Sigillito, knew that funds received from later lenders in the BLP were often used to pay principal and interest due prior lenders.

## COUNT I
### (VIOLATION OF UNIFORM FIDUCIARIES LAW, § 469.270, *ET SEQ.*)

Plaintiffs, as Count I of their Complaint against Defendants for violation of Missouri's Uniform Fiduciaries Law, § 469.270, *et seq.*, allege:

137.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

138.    In 2007, Defendants had notice that Sigillito could be using fiduciary funds out of his IOLTA account that did not belong to him to pay personal debt.

139.    Despite having notice that Sigillito could be embezzling fiduciary funds out of his IOLTA account, Defendants failed to inquire of anyone, including Sigillito and Smith,

or make sufficient inquiry whether Sigillito was breaching his fiduciary obligations with respect to his IOLTA account and the money in the account that belonged to Plaintiffs or other third parties.

140.   Defendants' failure to inquire whether Sigillito was committing a breach of his obligation as fiduciary in using money from his IOLTA account to pay personal debt is and amounts to bad faith as that term is used in the UFL.

141.   Defendants by their conduct alleged herein acted with actual knowledge of Sigillito's breach of his fiduciary duties with respect to his IOLTA account or acted in bad faith as that term is used under the UFL.

142.   Defendants' conduct and bad faith was a substantial factor in causing Plaintiffs' pecuniary injuries and financial losses, which injuries and losses at all relevant times were reasonably foreseeable to Defendants.

143.   As a direct and proximate cause of Defendants' conduct and bad faith, Plaintiffs were injured and suffered financial loss.

144.   Defendants' liability for violating the UFL as alleged herein extends to each of Sigillito's subsequent transfers of Plaintiffs' funds from his IOLTA account in breach of his fiduciary duties and obligations to Plaintiffs.

145.   Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(A).   For an award of actual damages against Spencer Fane Britt & Browne LLP and James Dankenbring, jointly and severally, in an amount to be proven at trial in excess of $25,000;

(B).   For an award of prejudgment interest at the applicable statutory rate;

(C).   For an award of punitive damages in a amount that equals at least seven times the amount of actual damages;

(D).   For costs of this suit, including reasonable attorneys' fees; and

(E).   For such other and further relief as this Court may deem just and proper.

## COUNT II
### (VIOLATION *PER SE* OF UNIFORM FIDUCIARIES LAW, § 469.270, *ET SEQ.*)

Plaintiffs, as Count II of their Complaint against Defendants for violation of Missouri's Uniform Fiduciaries Law, § 469.270, *et seq.*, allege:

146.   Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

147.   Defendants at all relevant times had knowledge that the checks and wire transfer from Sigillito on the dates and in the amounts as alleged herein were for Sigillito's personal benefit.

148.   The money Sigillito used to fund the checks and wire transfer sent to Defendants as payee on the dates and in the amounts as alleged herein came from Sigillito's IOLTA account and belonged to Plaintiffs.

149.   Sigillito's use of Plaintiffs' money deposited into his IOLTA account to fund the checks and wire transfer to Defendants as alleged were, in fact, a breach of Sigillito's fiduciary duties and obligations owed to Plaintiffs.

150.   Defendants by their conduct alleged herein are therefore liable *per se* under § 469.270 of the UFL.

151.    Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants Spencer Fane and Dankenbring as follows:

(A).    For an award of actual damages against Spencer Fane Britt & Browne LLP and James Dankenbring, jointly and severally, in an amount to be proven at trial in excess of $25,000;

(B).    For an award of prejudgment interest at the applicable statutory rate;

(C).    For an award of punitive damages in a amount that equals at least seven times the amount of actual damages;

(D).    For costs of this suit, including reasonable attorneys' fees; and

(E).    For such other and further relief as this Court may deem just and proper.

### COUNT III
#### (AIDING AND ABETTING FRAUD)

Plaintiffs, as Count III of their Complaint against Defendants for aiding and abetting fraud, allege:

152.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

153.    Sigillito was operating a scheme to defraud Plaintiffs.

154.    Dankenbring and Spencer Fane, acting by and through Dankenbring, knew of Sigillito's fraudulent scheme.

155.    Defendants actively provided substantial assistance to Sigillito in his scheme to defraud Plaintiffs. As more fully described throughout this Complaint, Defendants'

assistance included advising Sigillito how to operate a program, which they understood operated as a Ponzi scheme, to avoid liability under federal and state laws; accepting payment of funds that Defendants knew or should have known were embezzled through Sigillito's IOLTA account; counseling Sigillito on how to conceal the true nature of the BLP with knowledge that it operated as a Ponzi scheme; actively participating in Sigillito's intentional efforts to keep Millennium Trust from contacting Smith; actively assisting Sigillito's efforts to mislead Millennium about reasons for not providing Smith's contact information; directing the concealment of the BLP by advising Sigillito and others in communications with state securities regulators in connection with the BLP; perpetuating Sigillito's scheme and fraud by helping draft and counseling Sigillito about an indemnification agreement with Millennium Trust intended to conceal the true nature of the BLP and intended to allow the scheme to continue undetected; actively participating and assisting as alleged in the Complaint in Sigillito's attempts to conceal the true nature of the BLP and prevent disclosure of information that would bring the fraud to light; and accepting embezzled funds and laundering money from the IOLTA account as part of efforts to perpetuate the Ponzi and embezzling scheme.

156.    Defendants at all relevant times knew their conduct as alleged was enabling the Ponzi and embezzling scheme to continue and made it reasonably foreseeable that the Ponzi and embezzling scheme would continue and attract new investor victims.

157.    Defendants' actions materially assisted and perpetuated the scheme and aided Sigillito in causing injury and damages to Plaintiffs.

158.    As a direct and proximate cause of Defendants' actions, Plaintiffs have been damaged in an amount in excess of Eleven Million Dollars ($11,000,000).

159.    Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants Spencer Fane and Dankenbring as follows:

(A).    For a joint and several award of actual damages against Spencer Fane Britt & Browne LLP and James Dankenbring, jointly and severally, in an amount to be proven at trial in excess of $25,000;

(B).    For an award of prejudgment interest at the applicable statutory rate;

(C).    For an award of punitive damages in a amount that equals at least seven times the amount of actual damages;

(D).    For costs of this suit, including reasonable attorneys' fees; and

(E).    For such other and further relief as this Court may deem just and proper.

## COUNT IV
### (CONSPIRACY)

Plaintiffs as Count IV of their Complaint against Defendants, allege:

160.    Each of the other paragraphs of this Amended Complaint is incorporated by reference as if fully set forth herein.

161.    With knowledge that the BLP operated as and was a Ponzi scheme, Defendants agreed with Sigillito to:

(A).    Conceal the true nature of the BLP and alter its operations avoid detection and liability under federal and state law with knowledge that the BLP operated as a Ponzi scheme;

(B).    Conceal the true nature of the BLP by misleading Millennium on the true reason for not disclosing or providing Smith's contact information or putting Millennium in contact with Smith;

(C).    Use fiduciary investor funds from Sigillito's IOLTA account to pay Sigillito's debts to Defendants;

(D).    Transfer fiduciary funds from Sigillito's IOLTA account to Spencer Fane and/or Dankenbring as payee for Sigillito's benefit;

(E).    Have Sigillito enter into an indemnification agreement with Millennium to conceal the true nature of the BLP and to allow it to continue undetected; and

(F).    Defendants agreed with Sigillito to mislead state regulators about the true nature of the BLP by emphasizing the personal investments of Sigillito and Brown as evidence that the BLP was not a fraudulent scheme.

162.    Defendants' agreements with Sigillito were substantial factors in Plaintiffs' pecuniary injuries and damages;

163.    Defendants reasonably foresaw that their agreements would injure Plaintiffs.

164.    The agreements between Defendants and Sigillito were intended to do unlawful acts or to do a lawful act for an unlawful purpose or by unlawful means.

165.    Defendants and Sigillito carried out their agreements.

166.    As a direct and proximate cause of Defendants carrying out the agreements with Sigillito, Plaintiffs have been damaged in the amount of approximately $11,067,804.

167.    Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray this Court enter judgment against Defendants Spencer Fane and Dankenbring as follows:

(A).    For a joint and several award of actual damages against Spencer Fane Britt & Browne LLP and James Dankenbring in an amount to be proven at trial in excess of $25,000;

(B).    For an award of prejudgment interest at the applicable statutory rate;

(C).    For an award of punitive damages in the amount of five times the amount of actual damages;

(D).    For costs of this suit, including reasonable attorney's fees; and

(E).    For such other and further relief as this Court may deem just and proper.

## COUNT V
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

COME NOW Plaintiffs and for Count V of their Complaint against Defendants Spencer Fane and Dankenbring for Aiding and Abetting Breach of Fiduciary Duty state as follows:

168.    All other paragraphs of this Complaint is incorporated by reference as though fully set forth herein.

169.    Spencer Fane and Dankenbring, acting within the scope of his agency and employment with Spencer Fane, at all relevant times had knowledge that:

(A).   Sigillito maintained an IOLTA account into which he deposited funds belonging to Plaintiffs for the purchase of loan investments in the BLP;

(B).   Sigillito owed fiduciary duties of honesty, loyalty, care and candor to investors, including Plaintiffs, whose funds were deposited into Sigillito's IOLTA account for the purchase of loan investments in the BLP;

(C).   Sigillito's IOLTA account was a fiduciary account;

(D).   Sigillito had fiduciary duties and obligations to Plaintiffs whose money was deposited into Sigillito's IOLTA account;

(E).   Money from Plaintiffs deposited into Sigillito's IOLTA account was fiduciary funds;

(F).   Sigillito was financially exploiting new investors and embezzling their funds deposited into his IOLTA account for personal gain and to fund his Ponzi scheme; and

(G).   Sigillito's financial exploitation of Plaintiffs and embezzlement of their funds deposited into his IOLTA account was a breach of Sigillito's fiduciary obligations to Plaintiffs whose funds were deposited into Sigillito's IOLTA account.

170.   Defendants actively participated in and provided substantial assistance to Sigillito in his financial exploitation of Plaintiffs and breaches of his fiduciary duties to Plaintiffs whose monies were deposited into Sigillito's IOLTA account.

171.    Defendants assisted and aided Sigillito in breaching his fiduciary duties to Plaintiffs by: (a) agreeing to accept as payee funds transferred from Sigillito's IOLTA account for payment of Sigillito's debts to Defendants and for payments for his benefit in transactions in which Defendants were payees of the checks and wire.

172.    Defendants' actions aided and abetted Sigillito in causing injury and damages to Plaintiffs.

173.    As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged in the amount of approximately $11,067,804.

174.    Additionally, Defendants' conduct was malicious and corrupt, as well as either intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants Spencer Fane and Dankenbring as follows:

(A).    For a joint and several award of actual damages against Spencer Fane Britt & Browne LLP and James Dankenbring in an amount to be proven at trial in excess of $25,000;

(B).    For an award of prejudgment interest at the applicable statutory rate;

(C).    For an award of punitive damages in a amount that equals up to seven times the amount of actual damages;

(D).    For costs of this suit, including reasonable attorneys' fees; and

(E).    For such other and further relief as this Court may deem just and proper.

**COUNT VI**
**(VIOLATION OF RICO 18 U.S.C. § 1962(c))**

**Page 33 of 44**

Plaintiffs, as Count VI of their Complaint against Defendants Spencer Fane and Dankenbring for violation of RICO 18 U.S.C. § 1962(c), allege:

175.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

176.    RICO, 18 U.S.C. §§ 1961-68, permits claimants in a civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

177.    18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise" to "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

178.    RICO defines a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). Racketeering activity is defined in 18 U.S.C. § 1961(1)(B) to include wire fraud in violation of 18 U.S.C. § 1343, and money laundering in violation of 18 U.S.C. § 1956.

179.    The wire fraud statute, 18 U.S.C. § 1343 prohibits anyone from "devising any scheme" to "defraud" to obtain "money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire" for the "purpose of executing such scheme." The money laundering statute, 18 U.S.C. § 1956 prohibits conducting a financial transaction with the proceeds of specified unlawful activity "knowing that the transaction is designed in whole or in part to conceal or disguise the

nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

180.   RICO defines "enterprise" as "any individual, partnership, corporation, or other legal entity." 18 U.S.C. 1961(4).

181.   At all relevant times, Spencer Fane, Dankenbring, and Sigillito, associated in fact with each other and with others as to constitute an "Enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). At all times relevant to this Complaint, the association in fact of Spencer Fane, Dankenbring, and Sigillito ("RICO Enterprise") was engaged in, and its activities affected, interstate and foreign commerce.

182.   The "association in fact" RICO Enterprise had an ascertainable structure and organization, and it existed apart from its predicate acts. Defendants associated with the RICO Enterprise through their personal involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the RICO Enterprise's activities.

183.   Dankenbring and Spencer Fane, acting by and through Dankenbring, associated with Sigillito other than for the common purpose of defrauding Plaintiffs and other investors in the BLP and converting their funds and property for Defendants' personal gain.

184.   In furtherance of the RICO Enterprise, Spencer Fane, Dankenbring, and Sigillito committed numerous overt acts, as set forth in this Complaint, including violation of mail fraud, wire fraud, and money laundering.

185.   The principal purpose of the racketeering conspiracy was to generate money for Defendants, the Ponzi scheme and BLP, and others through the operation of the RICO

Enterprise and various criminal activities, including wire fraud, mail fraud and money laundering

186.   Spencer Fane, Dankenbring, and Sigillito and others agreed to engage in a pattern of racketeering activity using various locations including ,but not limited to, Spencer Fane's offices located in St. Louis, to further the objectives of the RICO Enterprise.

187.   Spencer Fane, Dankenbring, and Sigillito knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c). Furthermore, Defendant Dankenbring was "employed by or associated with" the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c).

188.   Spencer Fane, Dankenbring, and Sigillito directed and managed the RICO Enterprise's activities, as more fully alleged throughout this Complaint, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).

189.   Spencer Fane, Dankenbring, and Sigillito conducted and participated in the RICO Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).

190.   In the course of conducting and participating in the Ponzi scheme and BLP RICO Enterprise, Defendants executed numerous predicate acts of racketeering activity, which are indictable under provisions of the U.S. criminal code enumerated in 18 U.S.C. Section 1961(1)(B), as more specifically alleged below. As described throughout this Complaint, Defendant engaged in a pattern of related and continuous predicate acts over a

substantial period of time. The unitary scheme began sometime in or around 2001 and continued until approximately May 2009.

191.    The predicate acts demonstrated a variety of unlawful activities, each conducted in furtherance of the RICO Enterprise and the common purpose to defraud Plaintiff and other victims and obtain millions of dollars. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts are related and are not isolated events.

192.    The predicate acts all had the purpose of diverting and misappropriating monies that Plaintiff and other victims had given to Sigillito which were deposited into Sigillito's IOLTA account at St. Louis Bank purportedly for investment in the BLP.  The predicate acts were committed or caused to be committed by Defendants, and were interrelated in that they involved using Plaintiffs' funds. Further, on information and belief, Defendants' misappropriations repeatedly involved diversion of funds for: (a) Defendants' personal benefit and (b) making various fund transfers from Sigillito's IOLTA account at St. Louis Bank to conceal the theft and embezzlement Plaintiffs' funds pursuant to the scheme. More specifically, Spencer Fane, Dankenbring, and Sigillito enhanced the credibility of the BLP by maintaining in IOLTA account at, and by utilizing the offices of St. Louis Bank to convince Plaintiff and others of the legitimacy and safety of the investments.

193.    By virtue of Spencer Fane, Dankenbring, and Sigillito's violation of 18 U.S.C. Section 1962(c), Plaintiffs have sustained substantial injury.

194.    Spencer Fane, Dankenbring, and Sigillito's RICO violations were the actual cause of Plaintiffs' damages, which would not have occurred without Spencer Fane, Dankenbring, and Sigillito's conduct. In addition, the acts and violations were the direct, natural, and proximate cause of damage to Plaintiffs including, but not limited to, the loss of Plaintiffs' funds. Spencer Fane, Dankenbring, and Sigillito profited from their RICO acts and used some proceeds to further their RICO Enterprise.

195.    Dankenbring and Spencer Fane, acting by and through Dankenbring, as alleged throughout the Complaint, knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c) by participating in the transfer of Plaintiffs' funds from the IOLTA to Levin in payment of a settlement for Sigillito's benefit; sending emails and letters by mail intended to mislead and conceal the true nature of the BLP as alleged herein, and knowingly accepting payments of fiduciary funds for Sigillito's debts to Defendants, all in furtherance of the RICO Enterprise and as more fully alleged throughout this Complaint.

196.    Spencer Fane, by and through Dankenbring, knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c).

197.    Dankenbring knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise within the meaning of 18 U.S.C. § 1962(c).

WHEREFORE, Plaintiff prays for judgment against Defendants Spencer Fane and Dankenbring as follows:

(A).   For joint and several damages against Spencer Fane Britt & Browne LLP and James Dankenbring in excess of Thirty Three Million ($33,000,000), which is the amount of Plaintiffs' direct financial loss, trebled in accordance with 18 U.S.C. § 1964(c);

(B).   For an award of prejudgment interest at the applicable statutory rate;

(C).   For costs of this suit, including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

(D).   For such other and further relief as this Court may deem just and proper.

## COUNT VII
### (VIOLATION OF RICO 18 U.S.C .§ 1962(d))

Plaintiff, as Count VII of their complaint against Defendants for violation of RICO 18 U.S.C. § 1962(d), allege:

198.   Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

199.   In violation of 18 U.S.C. Section 1962(d), Spencer Fane, Dankenbring, and Sigillito, and others known and unknown conspired with each other to violate 18 U.S.C. Section 1962(a)-(c).

200.   The objects of the conspiracy included, without limitation, the misappropriation of funds from Plaintiff and others by means of a scheme to defraud. By these misappropriations, Spencer Fane, Dankenbring, and Sigillito gained personal benefits; obtained funds directly from the conversion of Plaintiffs' funds for their own use; and fraudulently profited through their fraudulent scheme.

201.    Dankenbring agreed and combined with Sigillito and with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. Dankenbring by his words or actions, objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the RICO Enterprise. Dankenbring knew that the predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

202.    Spencer Fane, acting by and through Dankenbring, agreed and combined with Sigillito and with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. Spencer Fane, acting by and through Dankenbring, objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the RICO Enterprise. Spencer Fane, by and through Vogel, knew that the predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

203.    Enterprise, acting by and through Dankenbring, agreed and combined with Sigillito and Martin T. Sigillito & Associates Ltd., and with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. Enterprise, acting by and through Dankenbring, objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through

participation in the conduct of the affairs of the RICO Enterprise. Enterprise, by and through Dankenbring, knew that the predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

204.    Enterprise Financial, acting by and through Dankenbring, agreed and combined with Sigillito and Martin T. Sigillito & Associates Ltd., and with persons known and unknown to do a criminal or unlawful act, or a lawful act by criminal or unlawful means. Enterprise Financial, acting by and through Dankenbring, objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the RICO Enterprise. Enterprise Financial, by and through Dankenbring, knew that the predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. Section 1962(d).

205.    Dankenbring's agreement with Sigillito and Martin T. Sigillito & Associates Ltd., to engage in a pattern of racketeering activity can be reasonably inferred from: their close professional relationship; their mutual financial gain resulting from their pattern of racketeering activity; their use of bank accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others. Dankenbring's agreement with Sigillito and Martin T. Sigillito & Associates Ltd., was manifested by the number and similarity of the racketeering offenses committed by them as discussed throughout this Complaint.

206.    Spencer Fane's agreement, by and through Dankenbring, with Sigillito and Martin T. Sigillito & Associates Ltd., to engage in a pattern of racketeering activity can be reasonably inferred from: their close professional relationship; their mutual financial gain resulting from their pattern of racketeering activity; their use of bank accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others. Spencer Fane' agreement, by and through Dankenbring, with Sigillito and Martin T. Sigillito & Associates Ltd., was manifested by the number and similarity of the racketeering offenses committed by them as discussed throughout this Complaint.

207.    Enterprise's agreement, by and through Dankenbring, with Sigillito and Martin T. Sigillito & Associates Ltd., to engage in a pattern of racketeering activity can be reasonably inferred from: their close professional relationship; their mutual financial gain resulting from their pattern of racketeering activity; their use of bank accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others.

208.    Enterprise Financial's agreement, by and through Dankenbring, with Sigillito and Martin T. Sigillito & Associates Ltd., was manifested by the number and similarity of the racketeering offenses committed by them as discussed throughout this Complaint.

209.    Enterprise Financial's agreement, by and through Dankenbring, with Sigillito and Martin T. Sigillito & Associates Ltd., to engage in a pattern of racketeering activity can be reasonably inferred from: their close professional relationship; their mutual financial gain resulting from their pattern of racketeering activity; their use of bank accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others.

Enterprise Financial's agreement, by and through Dankenbring, with Sigillito and Martin T. Sigillito & Associates Ltd., was manifested by the number and similarity of the racketeering offenses committed by them as discussed throughout this Complaint.

210.   At least one overt and wrongful act was done by one or more of the conspirators to achieve the purpose of the conspiracy. Those acts were done pursuant to the common schemes and in furtherance of the objects of the conspiracy and in concert.

211.   As described above, the conspiratorial agreement was an agreement to participate in an enterprise which engaged in racketeering activity within the meaning of 18 U.S.C. Sections 1961(1) and 1962(a)-(c), in addition to an agreement to commit the multiple offenses underlying the racketeering activity.

212.   As described above, the conspirators engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. Sections 1961(5) and 1962(a)-(c). Dankenbring and Spencer Fane, Enterprise, and Enterprise Financial, each acting by and through Dankenbring, knew that the acts in furtherance of the conspiracy were part of a pattern of racketeering activity.

213.   As a result of one or more acts predicate to the conspiracy and Dankenbring's conduct or participation, and the conduct and participation of Spencer Fane, acting by and through Dankenbring, in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, Plaintiffs have sustained substantial injury, including loss of their investment funds.

214.   Dankenbring's and Spencer Fane' acts and violations were the actual cause of Plaintiffs' damages, which would not have occurred without the Defendants' conduct. In

addition, the acts and violations were the direct, natural, and proximate cause of damage to Plaintiffs, as set forth above.

WHEREFORE, Plaintiffs pray for judgment against Defendants Spencer Fane and Dankenbring as follows:

(A).   For joint and several damages against Spencer Fane Britt & Browne LLP and James Dankenbring in excess of Thirty Three Million ($33,000,000), which is the amount of Plaintiffs direct financial loss, trebled in accordance with 18 U.S.C. § 1964(c);

(B).   For an award of prejudgment interest at the applicable statutory rate;

(C).   For costs of this suit, including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

(D).   For such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.


Respectfully submitted,

  s/ Sebastian Rucci
LAW OFFICES OF SEBASTIAN RUCCI
Sebastian Rucci (E.D. Mo. 178114CA)
(*pro hac vice to be filed*)
401 E. Ocean Blvd., Suite 1240
Long Beach, CA 90802
Tel: (330) 720-0398
Fax:  (330) 954-0033
Email: SebRucci@gmail.com

Attorneys for Plaintiffs